**Jorge E. RODRIGUEZ, Plaintiff,**

**v.**

**Gen. Carl VUONO, individually in his capacity as Secretary of the Army; et al., Defendants.**

**Civ. No. 91–1167(JAF).**

United States District Court, D. Puerto Rico.

Feb. 25, 1991.

Harry Anduze–Montaño, Guillermo Ramos–Luiña, Pia Gallegos, San Juan, P.R., for plaintiff.

Lloyd Green, Trial Atty., Dept. of Justice, Washington, D.C., Osvaldo Carlo–Linares, Asst. U.S. Atty., San Juan, P.R., for defendants.

## OPINION AND ORDER

FUSTE, District Judge.

Plaintiff, Jorge E. Rodriguez, a medical doctor, seeks to rescind an enlistment contract with the United States Army. Dr. Rodríguez was called to active duty in May of 1990, at which time he was ordered to report to Ft. Sam Houston, Texas, on July 15, 1990.[1] As of February 13, 1991, he had failed to report to any military facility for duty in response to the order. Dr. Rodríguez claims that the enlistment contract, which he admittedly signed, is voidable by him because he was fraudulently induced into believing that he could never be called to active duty, but that instead he would only be required to complete National Guard or Army Reserve service *without* the potential for active duty. In the alternative, assuming that the contract was valid, Dr. Rodríguez argues that he could not be sent to active duty without being properly certified as being physically "qualified" for service, and that due to a foot condition and asthma, he was not so qualified. There was a warrant outstanding for Dr. Rodríguez' arrest, since he has been formally classified as a deserter from the Armed Forces.

In addition to the ultimate relief of rescission of the contract, plaintiff sought a temporary restraining order against arrest, which we denied. Instead, we set the matter down for an expedited hearing. Dr. Rodríguez seeks a preliminary injunction against the military to forestall any effort on their part to try to enforce the enlistment contract.

This matter went to a hearing on February 13, 1990. On the morning of the hearing, the Army filed a motion to dismiss the matter or, in the alternative, for summary judgment. The Army argues the following points:

1) The claim referring to Dr. Rodríguez' physical fitness is a matter for internal Army administrative review, and plaintiff has failed to exhaust his administrative remedies in that he has failed to take any administrative action at all. Consequently, the Army argues, this court lacks jurisdiction over the matter.

2) the action is properly viewed as a petition for a writ of habeas corpus. The "custodian" is Dr. Rodríguez' superior officer in western Texas. Therefore, the proper jurisdiction for this matter is the District Court for the Western District of Texas. It is implicit in this argument that the Army considers Dr. Rodríguez, although currently located in Puerto Rico, to be in the constructive custody of Army personnel in his assigned unit in Texas.

3) Finally, on the merits, the Army argues that the written contract between itself and the plaintiff is fully enforceable and is not voidable for the reasons advanced by the plaintiff.

## I.  Facts

A brief fact-finding was read into the record by the court at the conclusion of the hearing. We now summarize and supplement those findings.

---

1. There was some dispute as to whether plaintiff received his May 1990 order. In any event, he admits to being aware of the order to active duty as of August 1990. The question is not material to the case at hand.

## 1. *Contract Validity*

Jorge E. Rodríguez (now a medical doctor) was 17 years old in August of 1978. He was a college student at the University of Puerto Rico (UPR), majoring in Science. He signed up for the elective ROTC (Reserve Officers Training Corps) course. On August 14, 1978, Rodríguez signed a Student Contract with the ROTC program at UPR, as a "Non–Scholarship Cadet Enrolling in the Advanced Course." Since Rodríguez was a minor, the document was co-signed by his mother. The contract, in relevant part, states that:

> In connection with my graduation and completion of the ROTC program, I will apply for appointment as commissioned officer in the Army, will accept such appointment if offered, and:
>
> (1) (for non-prior service cadets) will serve as a commissioned officer for 6 years—to include an initial period of active duty of not less than 3 years—or, if the Army does not require my service on active duty, I will serve an initial period of active duty for training of 3 to 6 months and remain a member of and participate satisfactorily in the Reserve until the 8th anniversary of such appointment unless sooner relieved under other provisions.

The contract specifically provides that evasion of the contract, (*i.e.*, refusing to apply for or accept a commission if offered following graduation), will result in immediate active duty. (Part 1, Subpt. c).

As a result of signing the contract, plaintiff received a monthly stipend from the Army of $100 per month for the time in which he was finishing his undergraduate studies. Plaintiff participated in a summer Army program at Fort Bragg, North Carolina.

In 1980 plaintiff completed the ROTC course. In 1981 he completed his undergraduate studies. In accordance with the contract, he applied for and received a commission. In August of 1981, at age 20, plaintiff signed his "Oath of Office–Military Personnel" as a Second Lieutenant.

Plaintiff began medical school at the University of Puerto Rico in the fall of 1981.

Although his commitment to the military came due following his graduation, he applied for and received a "delay" or deferral. The delay program allows an already commissioned officer to continue his studies at the post-graduate level, putting off the commitment already incurred during the college years until after the completion of post-graduate studies. To accept the delay, plaintiff signed an agreement which stated in relevant part:

> An approved delay is subject to the conditions listed below.
>
> a. The determination as to whether I will serve on active duty or active duty training as set forth in the Supplemental Agreement attached hereto upon termination of my delay status rests with the Department of the Army.
>
> . . . .
>
> Having studied the above service requirements, I hereby volunteer for entry on active duty when and if my services are required. If I am excess to the needs of the active Army, I will fulfill the remainder of my statutory obligation by serving satisfactorily in the Ready Reserve.

The delay is valid for one year only, and must be renewed each year, at the discretion of the Army. Plaintiff chose the non-scholarship option, meaning that the Army would not pay plaintiff anything (stipend, tuition, or otherwise) during the period of the delay. The advantage for the Army in granting the delay is that the student eventually serves his or her time as a doctor, instead of a college graduate. Students choosing the scholarship program further increase their active duty commitment, in consideration for the scholarship money.

Plaintiff applied for and was granted a delay each year from 1982 through 1984. Each year he signed a form stating that "[m]y active duty will be the month following the month and year indicated in item 8, unless I am authorized further delay for other reasons, and I will be scheduled for active duty as soon as possible after my active duty availability date." After completing medical school in 1985, plaintiff sought and received a further special defer-

ment in order to pursue an internship and residency in orthopedic surgery. The form signed by plaintiff on August 6, 1984, at age 23, states that "I understand that I will be required to enter active duty at the completion of this program." The confirmation letter for this final deferment identified July 1990 as the active duty commencement date.

The Army activated plaintiff through an order issued in May of 1990, which required his presence in Texas in July of 1990. Plaintiff, who admits learning about the activation order by August 1990 at the latest, failed to show up as ordered. Instead, he made complaints about his status through Ohio Senator Metzenbaum's office.

Plaintiff testified that he made the decision to sign the original 1978 ROTC agreement after talking to the professors of the ROTC course at UPR. According to plaintiff, these professors told him that "it was a voluntary course," that it was appropriate for him, even though he had "no intention of entering the armed services." He testified that "the Army always told me they would be very flexible." He testified that he was given the impression that at the end of his college career, he could simply refuse to accept the commission, and that he would incur no obligation. When asked what he thought the $100 per month was for, he testified that it was merely a stipend, which helped to pay for cleaning uniforms and transportation to various ROTC activities. In essence, plaintiff testified that it was his belief that since he received only the stipend, and not a scholarship, he could only be forced into non-active duty in the Reserve or National Guard.

We find plaintiff's claim that he was told that he could simply refuse the commission at the end of college not credible. First, his testimony was less than convincing. Second, the statements are inherently unbelievable (that all the professors told him that there was no obligation under the contract). The contract itself is very clear about the obligation of the signer, and plaintiff shows us nothing to make us believe that statements were made which

falsely induced him to believe that the plain language of the contract had a meaning other than what was written in it.

Plaintiff then testified that he signed the 1981 Oath of Office papers under duress. He testified that following college, he went to the ROTC office and told the officers there that he did not wish to seek or accept a commission, and that he had no intention of entering military service, but wished only to continue his medical studies. He testified that they became very angry with him and shouted that he was obligated to sign the documents. They told him that they could have him thrown out of medical school if he did not sign for the commission.

Plaintiff stated that he did not sign that day, but instead wrote a letter saying that he had personal and family problems, and that he no longer wanted the commission.

He later returned to the ROTC office. On the second visit, the officers were no longer angry, although they told him that they were not going to let him continue his studies if he failed to honor his original contract and accept a commission. Plaintiff tried to negotiate a commission contract which specifically stated that he would not be forced into active service, but the ROTC officers told him that such an arrangement would not be possible. Ultimately, according to plaintiff, he signed the forms. He understood that "as I had not accepted any money [scholarship], I was going to sign, but when I finished my studies I was going to join the National Guard or Reserve for the time I was signing up." The ROTC officers at the time told him that "most graduates who did ROTC would enter National Guard or Reserve and that as long as I didn't receive any money, [during medical school] my commitment would be fulfilled." In other words, according to plaintiff, the ROTC officers led him to believe that although the document specifically referred to active duty (indeed, it was that element that scared plaintiff off from signing originally) the Army would agree not to require active duty from him since he was a non-scholarship commissioned officer. Plaintiff claims that the

"Army Reserve" to which he could be assigned could never entail any active service.

We find plaintiff's testimony credible up to a point. We find that the officers at ROTC were indeed angry with plaintiff, and that they threatened to exercise the option in the 1978 ROTC agreement which allowed them to call plaintiff to active duty for failing to accept his commission as required. We find it credible that the officers tried to sooth plaintiff's concerns by telling him that most ROTC graduates never went into active duty. We find, however, that this assertion by the officers, rather than helping plaintiff's case, actually negates his assertion that he was *promised* that he would never be sent into active duty. The statement that most ROTC grads are not called on to active duty is the same as saying that some *are* called to duty. Even if we credit plaintiff's statement that he believed that his status as a non-scholarship student protected him from active duty, we see no credible evidence supporting the proposition that such a belief was given to him by the ROTC officers. Given the clear language of the commission which alerts the signer to the potential for active service, and the fact that plaintiff specifically sought from the ROTC officers a contract eliminating such language, we find as a fact that the ROTC officers had no reason to believe that plaintiff was under any delusion as to the potential for active duty. Even if they tried to downplay the chances for active duty, and highlight the *possibility* that plaintiff, like many before him, *might* avoid active service, they did not misrepresent to plaintiff the nature of the contract that he was signing.

We find that plaintiff signed with full knowledge that he was potentially to be called for active duty.

### 2. *Physical Condition*

The delay contracts signed by plaintiff each year after college contain a clause to the effect that "my entry on active duty will be contingent upon Army requirements at the time I am determined to be qualified for active duty."

Plaintiff was examined by Army physicians on several occasions during the ten years in which he was involved with the Army. On most occasions he was found to be medically qualified for service, sometimes with a "waiver" for certain conditions. On many forms over the years, the plaintiff described himself as medically able to perform his active duty requirement, or "in good health." At one point, in July of 1989, one medical exam found plaintiff to be unfit, due to foot problems (plaintiff testified to having arthritis in the foot) and asthma. The author of the report, Dr. Pagán, testified that such a report, at least with respect to an already commissioned officer, would do no more than act as a red flag requiring further investigation. In this particular case, Dr. Pagán testified the finding of "unfit" was based on the plaintiff's own complaints, not on the exam. In any event, according to Dr. Pagán, even a medical condition which might keep a person from enlisting can, at the Army's discretion, be waived in order to retain a person already in the forces. In September of 1990, the Physical Review Board of the Army, after reviewing plaintiff's medical records, made the final determination that he was physically qualified for retention in the Army Reserve, with a medical waiver.

We find that as a factual matter, the Army had made its own determination that plaintiff was fit for the Army Reserve, which may include active service. Plaintiff never challenged that determination with the internal administrative remedial process. 10 U.S.C. § 938.

### II. Discussion

### 1. *Validity of the Contract*

██ District courts have jurisdiction to hear complaints regarding the validity of military enlistment contracts. *Pence v. Brown*, 627 F.2d 872 (8th Cir.1980) (promise that plaintiff would enter service as a major rather than a captain caused contract to be rescindable where military refused to comply); *Peavy v. Warner*, 493 F.2d 748 (5th Cir.1974) (rescission of military contract induced by fraudulent state-

ments); *Brown v. Dunleavy,* 722 F.Supp. 1343 (E.D.Va.1989) (enlistee fraudulently induced to join Air Force with false promise that he could serve on an air crew); *Schneble v. United States,* 614 F.Supp. 78 (S.D.Ohio 1985) (rescission of contract sought following government's breach); *Santos v. Franklin,* 493 F.Supp. 847 (E.D. Pa.1980) (reliance on written Navy statement); *Bemis v. Whalen,* 341 F.Supp. 1289 (S.D.Cal.1972).

■ The Army argues that we have no jurisdiction over the matter. The Army argues that this action is in the nature of a writ of habeas corpus, since the plaintiff is seeking to be "released" from the military. In the Army's view, since the date of plaintiff's commencement of active duty, plaintiff's superiors in west Texas have constructive possession of plaintiff. An action for a writ of habeas corpus is jurisdictionally proper only in the district where the custodian is located, even if the prisoner is elsewhere. *Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 495, 93 S.Ct. 1123, 1129, 35 L.Ed.2d 443 (1973).

■ We disagree with the Army's contention on this point. While it is true that many of the cited cases dealing with the rescission of military contracts involve writs, that is only because the plaintiffs are often already under the physical custody and control of the armed services. *See, i.e., Brown v. Dunleavy, supra.* Here, plaintiff's failure to report for duty has kept him, at least to date, from entering into custody of the armed services. Plaintiff, to date, is neither detained, restrained, or confined. *Schlanger v. Seamans,* 401 U.S. 487, 489, 91 S.Ct. 995, 997, 28 L.Ed.2d 251 (1971). We have jurisdiction over the military contract action presented here.

■ Claims that military induction contracts are invalid or have been breached are decided under traditional theories of contract law, rather than the law of any state. *Woodrick v. Hungerford,* 800 F.2d 1413 (5th Cir.1986), *cert. denied,* 481 U.S. 1036, 107 S.Ct. 1972, 95 L.Ed.2d 812 (1987); *Pence v. Brown,* 627 F.2d 872, 874 (8th Cir.1980); *Brown v. Dunleavy,* 722 F.Supp. 1343 (E.D.Va.1989); *McCracken v. United*

*States,* 502 F.Supp. 561, 569, n. 62 (D.Conn. 1980). Courts have often assumed this to be the case without providing adequate support for the proposition that such an application of a substantive federal rule absent a federal statute is justified after *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) ("[t]here is no general federal common law"), or in light of the Rules of Decision Act, 28 U.S.C. § 1652, which provides that "[t]he laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." The court in *Bemis,* 341 F.Supp. at 1291, for instance, justifies the application of "general" contract law by citation to a case decided forty-eight years prior to *Erie. In Re Grimley,* 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890).

We agree, however, that by design or accident, courts have been correct in applying a federal common law of military enlistment contracts. We look for analogies in other areas of so-called federal common law. In *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the FDIC brought suit in a federal district court seeking to recover on a note executed by a private bank. As in our case, the matter was a federal question because one of the parties was a creation of federal law, and the controversy implicated federally-based concerns. The matter in *D'Oench* was brought by a federal agency seeking to enforce governmental policy, yet no substantive statutory law existed which would govern the dispute. In a concurring opinion, Justice Jackson wrote:

> [N]o federal statute purports to define the [FDIC's] rights as a holder of the note in suit or the liability of the maker thereof. There arises, therefore, the question whether in deciding the case we are bound to apply the law of some particular state or whether, to put it bluntly, we may make our own law from materials found in common-law sources.

. . . .

The federal courts have no *general* common law, as in a sense they have no general or comprehensive jurisprudence of any kind, because many subjects of private law which bulk large in the traditional common law are ordinarily within the province of the states and not of the federal government. But this is not to say that wherever we have occasion to decide a federal question which cannot be answered from federal statutes alone we may not resort to all the source materials of the common law, or that when we have fashioned an answer it does not become a part of the federal non-statutory or common law.

*D'Oench,* 315 U.S. at 467–73, 62 S.Ct. at 683–87 (emphasis in original); *see also Deitrick v. Greaney,* 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940).

In *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), a U.S. treasury check fell into the wrong hands, and was cashed by means of a forged signature. The United States sought to recover the amount of the check from the bank which had originally accepted the forged endorsement. The district court had applied Pennsylvania law and denied recovery on the basis of Pennsylvania precedent. The Supreme Court agreed with the Court of Appeals that state law was not applicable:

[T]he rule of *Erie R. Co. v. Tompkins,* [cite], does not apply to this action. The rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law. When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power. This check was issued for services performed under the Federal Emergency Relief Act of 1935. [Cite]. The authority to issue the check had its origin in the Constitution and statutes of the United States and was in no way dependent on the laws of Pennsylvania or of any other state.

*Clearfield Trust,* 318 U.S. at 366, 63 S.Ct. at 574.

We see that the situation of a military enlistment contract is similar. The power of the government to maintain an army, declare war, and provide funds for such purposes is constitutionally based. The student officer enlistment programs which are the subject of a military enlistment contract are all created and delineated by federal statute. The pay to be issued under the military contract comes from the federal treasury. Since the authority to enter into enlistment contracts on the part of the government derives "from specific Acts of Congress passed in the exercise of a 'constitutional function or power,' [cite omitted], [t]heir rights, as well, should derive from a federal source." *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) (Federal rule of decision applied in federal government contract case). *Priebe & Sons Inc. v. United States,* 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947). We therefore find that a federal rule of decision is appropriate here.

Having decided that a federal decisional rule is applicable, however, is only the first step. It means only that the court is free to choose a decisional rule for the controversy. That does "not inevitably require resort to uniform federal rules." *Kimbell,* 440 U.S. at 728, 99 S.Ct. at 1458. The court may choose to adopt a state law rule. *Clearfield,* 318 U.S. at 367, 63 S.Ct. at 575; *see* Friendly, *In Praise of Erie–And of the New Federal Common Law,* 39 N.Y.U.L. Rev. 383, 410 (1964).

In *Kimbell,* the Court looked first to whether a uniform rule would help advance the policies behind the particular federal program. Second, the Court asked whether adoption of the state rule would frustrate the policy. In *Kimbell,* the Court faced the issue of whether contractual liens from federal programs like the Small Business Administration (SBA) should take precedence over private creditors' liens in the absence of a statute so directing. The Supreme Court held that while the district court had to choose a federal decisional rule, (that is, that the district court had the power to fashion a uniform federal rule or

adopt state law) the adoption of state debtor-creditor laws would be appropriate. *Id.* at 728–30, 99 S.Ct. at 1458–60. The Court found that the intricate web of state laws on the subject could be applied without interfering with the federal programs at issue, since the SBA carefully negotiated each loan individually, vitiating the potential benefit from a uniform federal rule. *Id.* The SBA, in negotiating, could easily take into account the local law rule regarding liens.

■ We believe that an enlistment contract is different. Such contracts are government forms disbursed to all parts of the country and signed without modification. The very essence of military procedure is uniformity. There is a federal interest in assuring that enlistees, through the various entry programs, enter on the same footing and with the same rights and duties as other enlistees who signed the same form. It would cut to the heart of military order if Private Jones from Maine could demand special treatment under his enlistment contract while Private Smith from New Jersey could not. We therefore find that a uniform federal rule based on general contract concepts should govern military enlistment contracts.

■ To analyze plaintiff's contract claim, we need to break it down into two parts, the 1978 original student ROTC contract and the 1981 Oath of Office. As to the first contract, plaintiff claims that there was fraud in the inducement in that he was led to believe that he either would never have to take a commission, or that if he did take a commission, he would never be called to active service. A contract which is entered into as a result of fraud in the inducement is *voidable* by the party against whom the fraud was committed. Unlike a *void* contract (such as a contract for an illegal purpose), a voidable contract is a valid contract, which can be enforced by either side unless the defrauded party seeks to exercise his or her option and rescind the contract.

■ In this case, we fail to find as a factual matter that any factually misleading statements were made. The contract was not entered into as a result of fraudulent inducement. In the most generous reading of the facts, plaintiff was mistaken in his impression of what accepting ROTC money meant. If a mistake is unilateral, that is, if only one side is mistaken and the other side had no reason to know of the confusion of the mistaken party, the mistaken party is still bound by the contract, even if, subjectively, the contract signed was not the contract which the mistaken party thought they were signing. A contract is not voidable nor void due to a unilateral mistake.

■ However, even if we were to assume that plaintiff, only seventeen years old, was indeed fraudulently induced into signing the 1978 contract, and that the contract was voidable, plaintiff's subsequent actions effected an affirmation. Where a party signs a contract that is voidable, but then goes on to continue to act in accordance with the terms of the contract even after learning of the facts which made the contract voidable (or after reaching the age of majority, in the case of contracts voidable for infancy), the party affirms the otherwise voidable contract. Plaintiff went on, after the 1978 contract, to continually affirm the original contract by signing document after document in which he affirmed his commitment to enter into active service.

■ Plaintiff also argues duress in the signing of his 1981 Oath of Office. He claims that the ROTC officers threatened him in the sense that they would get him thrown out of school if he refused to sign. A contract entered into under duress is voidable at the option of the pressured party. Unfortunately for plaintiff, the officers were doing no more than "threatening" to exercise exactly the options which were available to them as a result of the first contract. The 1978 contract required that plaintiff apply for and accept a commission. The 1978 contract stated that failure to do so could result in an immediate active duty order. In saying that plaintiff "had" to sign the Oath of Office and accept his commission, or he would have to leave

medical school, the ROTC officials were merely explaining the terms of the 1978 contract to him.

■ We cannot find that a second contract is voidable for duress, because the signatory was threatened with enforcement of a prior contract which might have been voidable for fraudulent inducement, *where the circumstances of the fraud are known to the signatory prior to signing the second contract.* In other words, when plaintiff went to the ROTC office in 1981, and became aware for the first time (according to him) that the commission that he was obligated by the 1978 contract to sign would require active duty, he should have exercised any right to void that first contract prior to signing the second. If plaintiff in 1981 believed that the 1978 contract came about as the result of fraud, he should have tried to effect a rescission then. We can only assume that he in fact affirmed the 1978 contract in signing the 1981 contract.

■ The same affirmation rule applies to the 1981 contract. Even if for some reason that contract was voidable by plaintiff, he affirmed it time and time again in his annual deferment agreements.

Plaintiff also claims that the 1981 contract is voidable because, even though he had tried to negotiate for a commission document which did not mention active service, he signed the document with the understanding that no active service would be necessary because he was not a scholarship student. This would fall into the general category of fraudulent inducement. We find no credibility in plaintiff's testimony on this point.

In *Lonchyna v. Brown*, 491 F.Supp. 1352 (N.D.Ill.1980), the court faced a situation similar to ours. The *Lonchyna* plaintiff had signed an enlistment contract at 19 years old while still a college student. He then went on to accept a commission, to enter medical school and to seek and receive yearly educational delays to finish his schooling. When he finally received his order to active duty, he sought to rescind the enlistment contract since he was a minor when he signed it. Although the court opined that the plaintiff probably did have capacity to contract under federal law, 10 U.S.C. § 2104, the court held that even if the contract had at one time been voidable on account of infancy, the plaintiff had ratified the contract with his subsequent actions.

We find that Dr. Rodriguez was properly enlisted into the armed services as a commissioned officer, subject to an active duty requirement.

2. *Exhaustion on Medical Condition Claim*

■ The reviewability of internal military decisions is limited. In *Peñagaricano v. Llenza*, 747 F.2d 55 (1st Cir.1984), the First Circuit specifically adopted the reasoning of *Mindes v. Seaman*, 453 F.2d 197 (5th Cir.1971). In *Mindes*, 453 F.2d at 199, the Fifth Circuit stated that:

> [A] court should not review internal military affairs in the absence of (a) an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations, *and (b) exhaustion of available intraservice corrective measures.* (Emphasis added.)

The military has a comprehensive internal system of military justice which would entertain plaintiff's complaint that his physical condition precludes him from being activated. 10 U.S.C. § 938. Plaintiff made no attempt in the months that have passed since he was ordered to active duty to avail himself of this procedure.[2]

We mention in passing that we see no substantive merit in plaintiff's claim. First, besides one isolated medical exam which recommended unfitness due to information he himself had supplied, his medical history appears to support the proposition that he had been declared fit for his duties. Second, there was testimony to this effect

---

2. We have no comment on counsel for plaintiff's absurd argument that contacting a Senator's staff in Ohio constitutes resort to an "administrative remedy" sufficient to satisfy an exhaustion requirement.

at the hearing that once an officer is commissioned, it is a matter within the discretion of the military to determine what state of physical condition will preclude activation. If the Army is willing to activate a reservist doctor who has medical problems, the Army has the discretion to waive its own requirements of fitness.

In any event, we do not reach the issue, but instead dismiss without prejudice so that plaintiff can take his claim through the proper procedures.[3] Our holding is in accord with *Ange v. Bush*, 752 F.Supp. 509, 518 (D.D.C.1990), in which a soldier claimed that he was not physically fit for service in the Persian Gulf. The court found that it was "not empowered to review the standards used by the Army to determine the deployability of soldiers."

### III. Conclusion

To date Dr. Rodriguez has had a ten-year history of involvement with the United States Armed Forces. He signed numerous documents over that time affirming his commitment to serve in active duty. He received consideration for his original commitment in the form of cash paid during college. At some point Dr. Rodriguez changed his mind, and regretted having made the decision to associate himself with the Army. Unfortunately for Dr. Rodriguez, the call to active duty which he had delayed throughout his post-graduate studies came at a time when he was no longer interested in serving. We find no basis to rescind or modify the contracts between Dr. Rodríguez and the United States Army.

This court will not grant injunctive relief. The petition for such relief is DENIED AND DISMISSED. The court DISMISSES plaintiff's claim that he is physically unfit for active duty in the U.S. Army for lack of

subject matter jurisdiction and without prejudice to renewal before the appropriate administrative forum.

Having reached the merits on the claim of breach of contract, we DISMISS that part of the complaint containing a claim of contractual rescission.[4] Judgment will be entered forthwith. This case is now closed for all purposes.

IT IS SO ORDERED.

---

**3.** We refused to accept the Army's view that both the rescission issue and the health issue are subject to an exhaustion requirement. Since the rescission action goes to the heart of whether the plaintiff is in the military in the first place, we could not require the plaintiff to exhaust remedies within the military.

**4.** We reach the merits on the rescission claim for the following reason. In addition to conducting a full evidentiary hearing, the Court asked plaintiff's counsel to make a full offer of any proof which he had been unable to present because of the expedited nature of the hearing. Plaintiff's counsel made several offers on the issue of physical fitness, but none on the issues of fraudulent inducement or duress in the signing of the enlistment documents. We must conclude that we have heard all that there is to be heard on that subject and, in that sense, we consolidate the hearing on the preliminary injunction with the trial on the merits. Fed.R. Civ.P. 65(a)(2).