**George H. IRBY, Jr., Plaintiff,**

**v.**

**The UNITED STATES OF AMERICA, DEPARTMENT OF THE ARMY, Defendant.**

**No. CIV.A. 203CV54.**

United States District Court, E.D. Virginia, Norfolk Division.

Feb. 14, 2003.

Robert W. McFarland, Steven R. Zahn, McGuire Woods LLP, Norfolk, VA, for Plaintiff.

Lawrence R. Leonard, United States Attorney's Office, Norfolk, VA, Gary Phillip–Matthew Corn, United States Army, Arlington, VA, for Defendant.

### *ORDER*

FRIEDMAN, District Judge.

The plaintiff has filed a complaint challenging the legality of an order requiring him to serve on active duty as an enlisted soldier in the United States Army. On January 23, 2003, the court granted the plaintiff's motion for a temporary restraining order (TRO) and allowed the plaintiff to amend his complaint to reflect a claim for habeas relief. On February 4, 2003, the court heard oral argument with respect to the plaintiff's motion for a preliminary injunction. Based on the briefs submitted by the parties, the testimony of the witnesses, the arguments of counsel at the

hearing, and for the reasons stated on the record and set forth below, the court **DENIES** the plaintiff's motion for a preliminary injunction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff was a student at Hampton University from 1996 to 2000. While enrolled, he was a member of the Reserve Officer Training Corps (ROTC) and received scholarship benefits as a result. On August 26, 1996, Irby executed two contracts[1] with the United States Army regarding the ROTC scholarship and his expected return commitments. In at least three separate provisions, Irby's Cadet Contract provided that he would incur an active duty or reimbursement obligation should he withdraw from the program after the first day of his second year of military education. One term clearly stated that the decision to order active duty or to reimburse the United States was within the Army's discretion. By virtue of his Enlistment Contract, Irby enlisted in the Armed Forces of the United States and was conditionally assigned to the U.S. Army Reserve Control Group (ROTC).

Irby graduated in December, 2000 and was scheduled to be commissioned in the Army in February, 2001. In a conversation occurring on February 8, 2001 with his commanding officer, Lt. Colonel Wendell Turner, Jr., Irby expressed his desire to decline his commission, claiming that his family needed him to help care for his ailing grandparents.[2] A day later, Irby's mother also contacted Turner to discuss the problem. Turner submitted a memorandum for record written February 19, 2001 documenting both conversations.

Turner stated that he was skeptical of Irby's reasons and thought his decision was foolish. He stated that he informed Irby of the ramifications of his decision— that Irby would be made to repay his scholarship or could be involuntarily ordered to active duty. Turner also noted that Irby's mother asked if they could repay the loan, and he informed her that he was suspicious of her son's reasons for refusing his commission and that he had not yet decided because he had his doubts. The conclusion of the memorandum stated that he would recommend that Irby "be made to repay the Army scholarship and be ordered to active duty."[3] Def's. Ex. 7 at 23. Apparently this decision was premised on Turner's disbelief that Irby's concerns for his family were at the root of his decision to reject his commission, as well as Turner's awareness of "past indicators of [Irby's] half-hearted commitments to military service...." *Id.* With unusual prescience, Turner concluded that he "would not be surprised if the family happens to find the funds to get the best legal team that money can buy to thwart this action." *Id.* Irby's disenrollment packet was forwarded to him in early March, 2001, and on March 12, 2001 he submitted the completed packet. In the interim, Irby communicated with Randy Siders, a retired Army sergeant serving in an administrative capacity with the ROTC program, regarding his disenrollment questions. Because it was clear that Irby was not contesting the reason for his disenroll-

---

1. An Enlistment Contract and a Cadet Contract.

2. There is a factual dispute as to the exact reasons for Irby's desire to decline his commission. Testimony from Lt. Colonel Wendell Turner, Jr. indicates that Irby expressed a number of concerns, one of which was his grandparent's health. The exact reasons are not relevant to the court's decision.

3. At the hearing, Turner acknowledged that it was an error to recommend both repayment and active duty.

ment—breach of contract—and because Irby indicated that he did not dispute the amount of money he owed, Siders recommended that Irby waive his right to board review of his disenrollment.

Over the following few months, Irby's packet was supplemented and forwarded up the chain of command. Ultimately, on September 10, 2002, the Assistant Secretary of the Army (Manpower and Reserve Affairs) Reginald Brown approved the recommendation that Irby be ordered to active duty. Irby was ordered to active duty on October 25, 2002, with an eventual report date of January 27, 2003. In response, Irby retained counsel and sought a meeting with an Army representative. At this meeting, Army JAG officer Major Joe Marshall apparently agreed to extend Irby's report date in light of certain claims he had made regarding his disenrollment. When Major Marshall inquired further into the disenrollment, he became convinced that Irby had misrepresented certain facts to him, and therefore, Marshall withdrew his promise to extend Irby's report date. The instant complaint was immediately filed, alleging a breach of contract arising from this promise and claiming jurisdiction under 28 U.S.C. § 1346. The plaintiff requested that the court impose a TRO and preliminary injunction. At the TRO hearing, the court stated it did not believe it had jurisdiction to hear a breach of contract action that requested only injunctive relief. The court therefore granted the plaintiff's oral motion to amend the complaint to add a claim for habeas relief and a request for damages of $9,999.

## II. ANALYSIS

### A. Jurisdiction

■ As noted, there are currently two claims before the court: a breach of contract claim and a claim for habeas corpus relief. In issuing the TRO, the court commented that it had doubts as to its jurisdiction over the plaintiff's breach of contract claim premised on 28 U.S.C. § 1346, because the relief requested was solely equitable in nature and an injunction is not an available remedy under that statute. *See Richardson v. Morris,* 409 U.S. 464, 465, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973); *Berman v. United States,* 264 F.3d 16 (1st Cir.2001); *Bobula v. Dep't of Justice,* 970 F.2d 854, 858–59 (Fed.Cir.1992). In response, the plaintiff added a demand for money damages. The fact that there exists money damages in a complaint does not alone provide jurisdiction to hear this claim. The claim must also allege a money-mandating provision and the monetary damages must not be merely ancillary to the request for injunctive relief. On the contrary, it is the injunctive relief that must be incidental to the monetary relief. *See Randall v. United States,* 95 F.3d 339, 347 (4th Cir.1996). The court believes that the monetary relief in this case is merely ancillary to the request for an injunction. While the court will not yet dismiss this claim because the preliminary injunction hearing was solely devoted to the plaintiff's habeas claim, the court does note that the plaintiff should allege a sufficient alternative jurisdictional basis for this claim or face the possibility of dismissal.

■ For a court to consider the plaintiff's second claim, a petition for habeas corpus relief, there are two jurisdictional prerequisites: 1) the plaintiff must be in custody, *see* 28 U.S.C. 2241(c)(1), and 2) the suit must be filed in the district where the petitioner is in custody. An order to active duty has been considered custodial for purposes of a habeas petition. *See Karlin v. Clayton,* 506 F.Supp. 642, 647 (D.Kan.1981) (collecting cases). Such cases typically involve a reservist ordered to active duty, but it is clear that the plaintiff is

not considered a civilian by the military. In fact, a cadet in a college ROTC program is technically an Army reservist. *See* Def's. Ex. 7 at 11 (Enlistment Contract). Disenrollment from ROTC does not always coincide with a discharge from the military, and in this case, Irby was disenrolled and ordered to active duty. The court is satisfied, and the Army does not contest, that he meets this jurisdictional prerequisite.

The second component of jurisdiction is more a consideration of proper venue. The plaintiff must sue where his custodian is found. Early case law took a narrow, formalistic view of this mandate, some courts requiring that the party sue in the district where he had been ordered to report for active duty or where his literal "custodian" was located. *See Crowley v. United States,* 388 F.Supp. 981, 986 (E.D.Wis.1975). Today, courts employ a broader "sufficient contacts" analysis derived from the Supreme Court's discussion in *Strait v. Laird,* 406 U.S. 341, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972). Consequently, a plaintiff may sue in a district where he had sufficient contacts with the military, even if he was ordered to active duty in another district. *See Moreno v. Commander, McChord Air Force Base,* 567 F.Supp. 1437, 1439 (D.Ariz.1983) (plaintiff ordered to active duty in Washington state).

Either characterization of proper venue would undoubtedly apply in this case due to the Eastern District of Virginia's unique position as home to numerous military command headquarters, and the plaintiff's relationship with the district. The plaintiff's ROTC training occurred entirely in this district at Hampton University. The United States Army Cadet Command

headquarters is located at Fort Monroe in this district, and the Pentagon, where his disenrollment was processed, also is located in this district. Any correspondence with the military occurred solely within this district, and the final meeting with Major Marshall occurred in this district. Under any jurisdictional analysis, this court is a proper location for the plaintiff's lawsuit.

## B. The Preliminary Injunction

■ Courts in this circuit address the merits of a motion for a preliminary injunction through the four factors and balancing test laid out in *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir.1977). Under *Blackwelder,* a court must consider: (1) the likelihood of irreparable harm to the plaintiff; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest.[4] *Id.* at 193.

■ The most important consideration is balancing the harm to the plaintiff against the harm to the defendant. Consequently, a court must first address this balancing of the equities and then weigh the remaining factors accordingly. If the balance of harms tilts decidedly in favor of the plaintiff, he is only required to show that he has "raised questions going to the merits, so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Id.* at 195. If the harms are roughly equivalent, he must make a clear showing of a likelihood of success. *See id.* at 196; *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 811–13

---

**4.** The court will deal with the likelihood of success last as it is the most complicated factor.

(4th Cir.1991). This is not a choice between two discrete burdens of proof. Instead, these are merely two points along a sliding scale, and the court adjusts the plaintiff's burden to reflect the weighing of the relative harms. The court will address the factors in terms of the plaintiff's habeas claim alone.

### 1. *Harm to the Plaintiff*

█ At the outset, the court clarifies that its findings as to these factors detailed in the TRO and at the hearing on the TRO were premised on what was known at that time. Consequently, the court is not bound by these findings in assessing these same factors for purposes of the preliminary injunction ruling. In the interim, the court has received three briefs from the parties, numerous exhibits, and heard witness testimony clarifying the particular facts of this case, and the court finds that much has changed with regard to its understanding of this action.

The court made its earlier finding of irreparable harm to the plaintiff based, in part, on the fact that the TRO hearing was held on a Thursday, with only two days notice to the court, and Irby was scheduled to report to active duty on the following Monday. As late as the previous week, he had a reasonable expectation that his report date might be delayed, but this did not occur. The court was quite concerned with the very compressed time frame. The TRO having issued, Irby has had an additional week to put his affairs in order and to prepare his argument for a preliminary injunction; therefore, the court does not view the harm to the plaintiff now is as great as it was on January 23, 2003.

The court does, however, recognize that the harm to the plaintiff is still significant and irreparable. Irby apparently has been forced to resign from this employment with the Pittsburgh Steelers and will have to report involuntarily for active duty in the Army sometime in the next few weeks if the court does not issue the injunction. This could have a permanently damaging effect on his career. More importantly, the act of serving involuntarily in the military could be characterized as irreparably harmful. Consequently, the court finds that there is still the probability of irreparable harm to the plaintiff, but the extent of this harm has been mitigated somewhat by the court's TRO.

### 2. *Harm to the Army*

For purposes of the TRO, the court was not convinced that the Army would suffer any real harm. The only harm that the Army adequately identified at the TRO hearing related to Irby missing his designated basic training cycle. In other words, a new recruit must report at the beginning of a cycle, which are scheduled throughout the year. The court was not convinced that this interference with Army scheduling was irreparable harm, if indeed, it was harm at all.

In its brief in opposition to the preliminary injunction, the Army was able to identify a very real harm to the Army's decision making. The court finds this harm to be irreparable and significant. The Army stated that when viewed in isolation, there would be little harm to granting the plaintiff's preliminary injunction. While the Army might place greater value on an individual who possessed certain specialized knowledge, like a doctor, a future private does not have a similar importance. There is harm, however, in viewing such cases in the aggregate. Without looking at the total effect of such cases, courts might consistently find that the harm tipped decidedly in favor of the plaintiffs. As a result, there would be few occasions when a preliminary injunction would not issue. Any plaintiff could allege

the weakest claims and temporarily forestall an order to active duty or other disagreeable military decision. The combined weight of such injunctions and their precedential force does very real, substantial harm to the Army.

As the final step in assessing each side's potential harm, the court must balance these competing interests. Having the benefit of the last eleven days to learn more about the circumstances of the case, the court concludes that the harms are not as disparate now as the court perceived them to be when entering the TRO. In fact, though the harm to the Army is somewhat removed and abstract and the harm to Irby is quite concrete and imminent, the court concludes that they are roughly equipoise. As such, the court will not give as much deference to the plaintiff when judging his likelihood of success on the merits as it did when granting the TRO.

### 3. Public Interest

While the public interest factor is often glossed over by courts, in this instance, there is a significant public interest. Though it may cut both ways, the court concludes that this factor favors the Army. As stated on the record, the public has an interest, particularly in light of current events, in seeing that the Army's discretionary decision making with respect to personnel decisions is effectuated with minimal judicial interference.

### 4. Likelihood of Success

#### a. Justiciability

Determining the likelihood of success requires the court not only to address whether the plaintiff might succeed on the substantive merits but also whether the court would even elect to hear his com-

plaint or defer to the military's judgment in making internal decisions. Consequently, the Army argues that the court must use the justiciability framework laid out in *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971), relying on the Fourth Circuit's clear application of the case in *Guerra v. Scruggs*, 942 F.2d 270 (4th Cir.1991). *Mindes* has been applied in this circuit solely to cases involving plaintiffs' attempts to prevent their discharge from the armed forces. *See, e.g., id.* It is unclear whether *Mindes* should apply in cases where plaintiffs challenge the legality of their status as members of the military and actually seek discharge. The Fifth Circuit, which decided *Mindes*, has held that this test is equally applicable where plaintiffs seek to avoid their active duty requirements. *See Woodrick v. Hungerford*, 800 F.2d 1413 (5th Cir.1986). Moreover, it is clear to the court that the factors discussed in *Mindes* are all necessary avenues of inquiry regardless of whether a court adheres to the test's formal structure. *See, e.g., Brown v. Dunleavy*, 722 F.Supp. 1343 (E.D.Va.1989) (discussing certain *Mindes* factors without reference to the case).

The *Mindes* framework consists of an initial two-factor threshold determination: 1) whether the plaintiff has alleged the deprivation of a constitutional right or that the military has acted in violation of applicable statutes or its own regulations, and 2) whether he has exhausted all available administrative remedies. If this initial part is satisfied, the court would then use a second four-factor test weighing 1) the nature and strength of the plaintiff's challenge, 2) the potential injury to the plaintiff if review is refused, 3) the type and degree of anticipated interference with the military function,[5] and 4) the extent to

---

**5.** Interference per se is insufficient; it must
seriously impede the military in the perfor-

which the exercise of military expertise and discretion is involved. *See Guerra,* 942 F.2d at 276 (citing *Mindes,* 453 F.2d at 201–02).

■ In considering these various factors, the court concludes that the *Mindes* analysis does not affect the large body of extant case law holding that actions concerning the obligations and rights contained in enlistment contracts and involuntary orders to active duty are, in general, properly reviewable by the judiciary. *See, e.g., Brown v. Dunleavy,* 722 F.Supp. 1343 (E.D.Va.1989); *Peavy v. Warner,* 493 F.2d 748 (5th Cir.1974); *Karlin v. Clayton,* 506 F.Supp. 642 (D.Kan.1981); *Lundgrin v. Claytor,* 619 F.2d 61 (10th Cir.1980). There are few instances that would invite judicial intervention in military affairs to a greater degree than matters relating to enlistment contracts. As this district court has noted, such contractual dealings present "a crucial intersection of the military and the general public that cannot be left to the sole discretion of the military." *Brown,* 722 F.Supp. at 1349.

The court declines to engage in a detailed *Mindes* analysis tailored to the facts of this case, however, because any such discussion of justiciability currently is unnecessary. The court finds that its assessment of the strength of the plaintiff's argument is dispositive with regard to the instant motion for a preliminary injunction. Although the court concludes that the matter appears to be justiciable, the plaintiff's inability to demonstrate a likelihood of success on the merits precludes the court from granting the preliminary injunction. If the court is incorrect, and

the matter is non-justiciable, the ruling is unaltered. Moreover, the plaintiff did not address the applicability of *Mindes* to his case or the issue of justiciability in his brief, nor was the issue raised at the hearing by either party or the court.[6] Consequently, any further commentary on this topic would be premature. A thorough discussion of the merits of the plaintiff's various allegations is, however, necessary. Because of the breach of contract claim's likely jurisdictional infirmity, the court will confine its analysis to the claim for habeas relief.

b. The merits of the claim

The plaintiff's habeas claim states that the Army's seizure of the plaintiff violated his procedural and substantive due process rights and was contrary to the laws of the United States. More specifically, the plaintiff makes three allegations: First, he claims that the order to active duty contravened Army policy in effect when he applied for disenrollment; second, that the amount of time that elapsed between when he executed his disenrollment and when the Army ordered him to active duty, 21 months, also violated him due process rights; and lastly, Irby claims that he waived his rights to a hearing on the basis of misrepresentations by the Army that he would be permitted to repay his scholarship funds, and that the Army, by way of estoppel, must allow such repayment in lieu of active duty.

The plaintiff's first allegation, that the Army acted contrary to a policy in existence at the time of disenrollment to offer

---

mance of vital duties. *See Guerra,* 942 F.2d at 276.

**6.** The court also notes that the most important issue in *Mindes,* administrative exhaustion, was inadequately briefed. The Army contends that the plaintiff should first resort

to the Army Board for Correction of Military Records (ABCMR), but has provided no support. While the court found case law requiring resort to this board in a number of contexts, it is unclear that the specific facts of this case mandate it.

recoupment instead of active duty, is incorrect. The evidence before the court indicates that such a policy did exist but it was rescinded in 1999, over a year before Irby sought disenrollment. The policy, which was issued in January of 1991, stated that "scholarship cadets found to be in voluntary breach of contract ... will first be given the option of making monetary reimbursement." Def's. Ex. 2. This policy was rescinded in August of 1999. *See* Def's. Ex. 3. It is clear that the policy was in effect when Irby signed his Cadet Contract in 1996, but that the policy was no longer in effect in 2001 when he sought disenrollment.

■ Courts have held that regulations in effect when a government contract was signed are incorporated into the contract and govern even if the regulation is changed. *See Harris v. Brown,* 470 F.Supp. 250 (W.D.Mo.1979). In *Harris,* the military regulation in effect at the time of contracting was that personnel becoming pregnant would be discharged. The regulation was amended and, thereafter, the plaintiff became pregnant and the military refused to discharge her. The court held that the regulation in effect at the time of contracting was controlling. The Department of the Army directive at issue here, mandating offers of repayment, is characterized as a *policy* rather than a regulation. While this ultimately may be a distinction without a difference, at this juncture, the court concludes otherwise.[7]

The memoranda implementing the repayment policy in 1991 and rescinding it in 1999 give no indication that this is anything more than an internal, discretionary, non-binding Army policy. It is not part of the governing body of Army ROTC regulations, AR 145–1, nor is it found in a statute or other formal federal regulation. The plaintiff has not offered, nor has the court found, any support for the notion that such a policy should bind the Army. Additionally, though it seems that the information was prepared in a pamphlet that cadets may have had access to, no evidence was presented that the plaintiff knew of this policy when he signed his contract, let alone relied on it.

It seems clear to the court that from 1991 to 1999, the Army was offering repayment in lieu of active duty because of manpower considerations, at all times reserving the right to change policy and reimplement the harsher alternative. The enlistment contract itself specifically gives the military the discretion to order either repayment or active duty even though the repayment policy was in effect at that time. It appears that the policy was simply an internal order from the Department of the Army to its officers regarding their dealings with ROTC cadets. Given the necessity of deferring to the military's assessment of its manpower needs, this should be the proper interpretation. If the military determines that it has an overabundance of officers, it should be free to offer repayment in order to limit the number of officers entering active duty. Should that need change, as it apparently did, *see* Def's. Ex. 1, att. 1, the Army needs the freedom to alter its policies without worrying about its effect on those soldiers who entered prior to such a change.

---

**7.** Even if it was a formal regulation, the plaintiff may not have a meritorious argument. The federal government can alter statutes and regulations and give them retroactive effect. This is particularly true in matters involving the military. *See Pfile v. Corcoran,* 287 F.Supp. 554 (D.Col.1968). Additionally, the plaintiff's enlistment contract asserted that the agreement was subject to changes in laws and regulations affecting the military. *See* Def's. Ex. 7 at 12 (Enlistment Contract 9(b)).

The plaintiff's next charge is that the lapse of almost two years from the time he initiated disenrollment to the time he was ordered to active duty constitutes a violation of his due process rights. In granting the TRO, the court was also concerned with this fact as it seemed quite inequitable on its face. The Army's records, however, adequately account for the delay. After Irby completed his disenrollment packet, it was sent up the chain of command until it found its way to the Pentagon. Irby's file was destroyed and the officer in charge of his file was killed when terrorists attacked the Pentagon on September 11, 2001. When his file was reassembled and reassigned to another officer, a new Assistant Secretary of the Army (Manpower and Reserve Affairs) had been appointed who requested an information paper regarding ordering cadets to active duty, which was not completed and presented until June 17, 2002. *See* Def's. Ex. 1, att. 1. Although these issues do not entirely resolve the elapse of two years, the court has looked at the internal memoranda traveling up the Army chain of command, and there do not appear to be any substantial gaps indicating the Army was not diligently pursuing resolution of the matter.

Most importantly, although the court was concerned with the elapsed time from an equitable standpoint, it does not appear that the Army violated any regulations, policies, or procedures in this regard. Though the plaintiff has suggested that Army regulations require an order to active duty within 60 days of graduation from college, this requirement appears to be limited to certain cadets actually disenrolled during their college careers. The time period would be different for those no longer enrolled. *See* Army Regulation (AR) 145–1, 3–43(e) ("If not academically enrolled, the cadet will be ordered to active duty 60 days from date of notification of active duty.").

Lastly, the plaintiff claims that the Army represented to him that he would only have to repay his scholarship; therefore, the Army should be estopped from claiming otherwise and ordering him to active duty. This claim relies on the plaintiff's confusion regarding oral and written statements made to him throughout the disenrollment process. In looking at the record, the plaintiff points to a number of allegedly confusing statements in the Army's correspondence with him. The court will address the two most relevant statements specifically.

The plaintiff points to a statement Lt. Col. Turner made in his memorandum for record regarding his phone conversation with Irby. At the conclusion of the memorandum, Turner voiced his intent to recommend that Irby be ordered to active duty and be made to repay his scholarship. The plaintiff notes correctly that the Army cannot order both of these options and states that he was confused by Turner's representation that he could be so ordered. The court does not find this error to aid the plaintiff's case. At best he should have expected that both would be ordered rather than one or the other. If he was confused by this issue, he had a duty to clarify the issue. Despite his own testimony and that of his mother that they understood Turner's statement (and others) to mean that he risked being ordered to active duty *and* being made to pay, Irby did not ask any Army representative to clarify whether he could be ordered to do both. Nor would these statements give rise to a reasonable expectation that he would only be made to repay, as the plaintiff seems to suggest. No such conclusion could result no matter what reading was given the documents in the record before the court.

The plaintiff also points to a statement in the disenrollment packet discussing the alternative outcomes of active duty and repayment. The packet stated: "You may be called to active duty in fulfillment of your contractual obligation or if a scholarship cadet you may be required to repay scholarship benefits in the amount of $32,456.00 in lieu of call to active duty." Def's. Ex. 7, at 26, ¶ 9. The plaintiff claims that this statement and another portion of the disenrollment packet that discusses a disenrolled cadet, if eligible, electing an "expeditious call to active duty," led Irby to somehow believe that because he was a scholarship cadet, he would at worst only be required to repay his scholarship, not serve on active duty.

The court reads Paragraph Nine of the disenrollment packet as suggesting that a scholarship cadet might be required either to repay or to serve on active duty. The phrase "if a scholarship cadet" merely indicates that either option is possible for scholarship cadets, as opposed to non-scholarship cadets who, obviously, could not be faced with the possibility of repaying a scholarship they never received. Their only possibility (aside from a discharge with no obligation whatsoever) would be an order to active duty. The court interprets the "expeditious call to active duty" as an option that any cadet could choose, if faced with the possibility of involuntary active duty, in lieu of waiting months (or, in this case, two years) for the Army to make a final determination.

Any other written statements are of a similar type. The crucial fact regarding all written correspondence is that the Army did not make a single representation

that Irby would only have to repay his scholarship. The plaintiff claims that all the correspondence he received indicated that the Army would make a final determination as to repayment of funds, and "[n]ot one piece of correspondence ... indicated that Irby might be ordered to active duty in an enlisted status." Pl's. Reply Br. at 4. This assertion is flatly wrong. One letter the plaintiff cites in support of his declaration clearly states that "[h]is refusal to be commissioned ... subjects him to repay the cost of his financial assistance *or* to be involuntarily called to active duty as a private." Pl's. Ex. 1 (emphasis added).

Similarly, the testimony at the hearing indicates that there were no oral representations that he would only be made to repay the scholarship.[8] Though Irby and his parents claim they drew this inference from such conversations, the court has seen nothing to indicate that such a conclusion was reasonable. The two Army representatives who spoke with Irby and his parents, Turner and Siders, both credibly testified that they informed Irby of the possible outcomes of his decision to reject his commission and that the Army had the discretion to choose. At best, Irby claims that Turner did not mention active duty and that he gave no indication that Irby could not repay the scholarship. Such testimony is hardly significant evidence to support the claim that the Army told Irby he would only have to repay.

The testimony of Irby and his parents makes it clear that no Army representative promised Irby that he would only have to repay his scholarship. Nor does the court conclude that a reasonable person would have been led to believe that such

8. The plaintiff does claim that there was a representation made at the final meeting with Major Marshall that he would postpone the date Irby would have to report to active duty in order to allow time to review the validity of the disenrollment process. This allegation was the basis for the jurisdictionally infirm breach of contract claim and is not relevant to the court's discussion.

an option was the only one under consideration. If Irby and his parents were truly confused, they should have inquired further. If Irby was certain that he would only be made to repay, the court doubts that he would have enlisted his congressman and senator to make inquiries with the Army regarding his disenrollment. Of course, this last fact does not apply to what he may have thought when he first signed his disenrollment papers and waived a review board. The information before the court related to his initiation of disenrollment, however, when taken in combination with his Cadet Contract, indicates that there should have been no confusion as to what might happen to Irby when he disenrolled. The documentation that was forwarded to Irby as part of his disenrollment stated that he could face an order to active duty. As the court has already discussed, his contract contained several references to the potential for active duty.[9] Furthermore, twice in the fall of 1998, Irby signed documents reaffirming his understanding that if he was disenrolled he could face an order to active duty. *See* Def's. Ex. 7 at 18–21. The sole purpose of one of the memoranda was to discuss breach of ROTC contracts and point out to cadets the severe consequences of such action.[10] *See id.* at 21.

Finally, the court addresses arguments raised for the first time at the preliminary injunction hearing. First, the plaintiff claims that he waived a review board hearing on his disenrollment in reliance on misrepresentations from Siders and Turner; second, that Turner and/or Siders had a duty to correct his mistaken notion that he only had to repay his scholarship; and finally, that Turner and Siders were aware that he might be eligible for a hardship discharge, yet never informed him of this fact.

As to the first claim, there is nothing to suggest that Irby's waiver of his board hearing was not knowing and voluntary and was induced by Army misrepresentations. Army regulations require that a review board or investigating officer be appointed to determine if a cadet should be disenrolled. AR 145–1 3:43(b). The Department of Defense Directive (DoDD) concerning Senior ROTC programs requires that cadets be given notice and an opportunity to be heard. *See* DoDD 1215.8, ¶ 6.3.5. A cadet may elect to waive his board in writing. Siders did suggest Irby pursue this option, apparently because such a hearing would have been of no benefit to Irby, and Irby did waive his right to appear before a board.

A board is generally geared towards involuntary disenrollment and allows cadets the opportunity to challenge the basis for their disenrollment or the amount of money they owe to the Army. *See* Siders Test. Irby did not dispute that he was in breach of his Cadet Contract and was the one who pursued disenrollment. Nor did he dispute the amount of money he owed. Consequently, the court is unable to determine what value he would have derived from his board, nor has the plaintiff offered any reason why he would have benefitted from a board. Furthermore, all that

---

9. At the hearing, the plaintiff testified that when he signed his Cadet Contract that he was not permitted to read the contract, nor was he given a copy of the contract. The court finds this testimony to be somewhat incredible and irrelevant with regard to the claims currently before the court.

10. Though Irby testified he was unaware that he might face an active duty commitment when he signed the unread Cadet Contract, he did state he understood these memoranda. At the very least, then, he admits he knew of the potential consequence of being ordered to active duty by the beginning of his third year of college.

procedural due process requires in this instance is that Irby's waiver was knowing and voluntary. The Army supplied Irby with a disenrollment packet that explained his options to him, his contract explained his options to him, and Turner's memorandum states that he informed Irby of his options as well. Knowing all this, Irby waived his board. There is little, if anything, to suggest that the Army did not follow its own regulations in this instance.

With regard to his second claim, the plaintiff insisted that someone should have told him that he faced an order to active duty as an enlisted soldier. While there is a good deal of evidence that he was so informed, even assuming he was not, his disenrollment packet made this potential outcome clear, as did his Cadet Contract. The court cannot conclude that Army personnel had an additional duty to remind Irby at each step in the process of what he was getting himself into, nor is the court willing to assume that due process requires as much.

Finally, the plaintiff indicates that he should have been made aware that he might have been able to seek a disenrollment for personal hardship which would not have carried a potential active duty obligation. This issue was not raised in the briefs and became apparent only at the hearing. The testimony from Turner and Siders at the hearing indicates that they may not have adequately counseled Irby as to the possibility of a hardship discharge. Siders testified that he told Irby to submit medical documentation to support such a claim, but left it to Turner to assess the issue. Turner testified, oddly, that there was no hardship discharge from ROTC but the plaintiff did not press this issue in

questioning him. The court has read the ROTC regulations and, Turner's testimony notwithstanding, it appears that there is such a discharge. The court does not believe this argument is of sufficient import, however, to merit entering a preliminary injunction.

The court refrains from discussing this argument in great detail because neither party briefed the issue, it does not appear in the plaintiff's complaint, and it arose on cross-examination of Turner and Siders at the hearing. The court notes, however, that a personal hardship disenrollment is authorized by Army Regulation (AR) 145–1, 3:43(7). This part of the regulation cross references the standard Army regulation for a separation because of dependency or hardship, AR 635–200, Chapter Six. This regulation authorizes a discharge when hardship results from the death or disability of an immediate family member. *See* AR 635–200, 6:3. Grandparents are not included as members of the immediate family, unless they have stood in loco parentis or are the only living blood relative. *Id.* at 6:5. It would therefore appear that any failure to inform Irby of a potential hardship discharge was harmless because he was ineligible. The court also notes that Irby's personal hardship could not have been too severe given his testimony that he began employment with the Pittsburgh Steelers at most three months after initiating his disenrollment.[11]

c. Weighing the likelihood of success

As applied to the fourth prong in the *Blackwelder* analysis, in light of the testimony of the parties, the exhibits offered into evidence, and the parties' briefs, the court does not believe that the plaintiff has

---

11. Irby's family resided in the Richmond, Virginia area. Additionally, he testified that during late 2000 and early 2001 he was living in Cleveland, where he interned for the Cleve-land Browns. Irby testified that the organization allowed him time off to return home to help care for his grandparents.

made the requisite showing of a likelihood of success on the merits. He has failed to raise serious, substantial issues in the court's mind, let alone made a clear showing of a likelihood of success. For this reason, the court concludes that this factor is decisive. Even if the court found that the balance of harms tipped decidedly in favor of the plaintiff, he has failed to raise sufficiently meritorious issues as to the propriety of the Army's actions. His argument boils down to the fact that he and his parents were, at best, confused at to what was going to happen to him if he was disenrolled. Mere confusion is not enough to rescind his contract. There is little evidence that this confusion was reasonable, and less still that the Army should have known of this confusion and attempted to clarify his options. Even a unilateral mistake at the time he signed the contract most likely would not have rendered it voidable. *See Rodriguez v. Vuono,* 757 F.Supp. 141, 149 (D.P.R.1991) (holding enlistment contract not voidable due to unilateral mistake).

## III. CONCLUSION

The court concludes that on the facts before it this matter is probably justiciable, but the plaintiff has not demonstrated that he has any likelihood of success. In light of the balancing of the harms, this is a terminal failing, and it is clear to the court that even if the plaintiff's burden was reduced by virtue of a more favorable balancing of the harms, a preliminary injunction would still be inappropriate. The facts before the court at this time indicate that Irby should have been aware that he faced being ordered to active duty. There is no evidence that any Army representative misrepresented the discretionary nature of this choice, nor that anyone told him he would only have to repay his scholarship. Furthermore, the plaintiff has not been able to point to any specific statutes or regulations that would demonstrate that the Army's handling of the disenrollment was improper.

Given the deference that the judiciary must give the other branches of government, the court cannot order a preliminary injunction simply because a plaintiff claims that he was confused as to the ramifications of his actions in the absence of affirmative misrepresentations from the government. If a court seriously entertained such an allegation merely because a plaintiff had placed himself in a precarious situation like the one Irby finds himself in, there would be few occasions when a preliminary injunction was denied. Such an outcome would run contrary to the general rule that an injunction is an *extraordinary* remedy. *See Manning v. Hunt,* 119 F.3d 254, 263 (4th Cir.1997).

For the reasons given above and stated on the record, the court **DENIES** the plaintiff's motion for a preliminary injunction. The temporary retraining order issued in this matter on January 23, 2003 is hereby **DISSOLVED.**

The Clerk is **REQUESTED** to send a copy of this Order to counsel of record.

It is so **ORDERED.**