PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GLOBE NUCLEAR SERVICES AND
SUPPLY GNSS, LIMITED,
$\qquad$ *Plaintiff-Appellant,*

v.

AO TECHSNABEXPORT,
$\qquad$ *Defendant-Appellee.*

No. 04-1007

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CA-03-3339-8-DKC)

Argued: June 2, 2004

Decided: July 22, 2004

Before WILKINS, Chief Judge, LUTTIG, Circuit Judge,
and Louise W. FLANAGAN, United States District Judge
for the Eastern District of North Carolina,
sitting by designation.

Reversed by published opinion. Judge Luttig wrote the opinion, in
which Chief Judge Wilkins and Judge Flanagan joined.

## COUNSEL

**ARGUED:** Andrew Kelly Fletcher, PEPPER HAMILTON, L.L.P.,
Pittsburgh, Pennsylvania, for Appellant. Carolyn Beth Lamm,
WHITE & CASE, Washington, D.C., for Appellee. **ON BRIEF:** John

C. Hansberry, Richard M. Weibley, PEPPER HAMILTON, L.L.P., Pittsburgh, Pennsylvania; Charles H. Carpenter, PEPPER HAMIL-TON, L.L.P., Washington, D.C., for Appellant. Frank Panopoulos, R. Shawn Gunnarson, Nicole Erb, Paul F. Stone, WHITE & CASE, Washington, D.C., for Appellee.

---

**OPINION**

LUTTIG, Circuit Judge:

Appellant, Globe Nuclear Services and Supply, Ltd. (GNSS), a Delaware corporation headquartered in Maryland, brought suit in the district court seeking an injunction against appellee, AO Techsnabexport (Tenex), a Russian company that is wholly owned by the Russian Federation. The catalyst for GNSS's lawsuit was Tenex's announcement that it would no longer perform under its contract to supply GNSS with uranium hexafluoride that Tenex received in exchange for uranium derived from dismantled Russian nuclear warheads. The district court dismissed GNSS's lawsuit for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602 *et seq.*, holding in particular that Tenex's conduct giving rise to GNSS's lawsuit did not constitute a "commercial activity." We hold that the district court erred in this holding. Because Tenex's conduct underlying GNSS's lawsuit did constitute a "commercial activity," Tenex cannot claim immunity under the FSIA. The case, accordingly, must be remanded to the district court for further proceedings.

## I.

In 1993, the United States and the Russian Federation entered into an agreement "Concerning the Disposition of Highly Enriched Uranium (HEU) Extracted from Nuclear Weapons." The United States' Executive Agent under this agreement is the United States Enrichment Corporation (USEC), and Russia's is the Ministry of Atomic Energy (MINATOM), which has appointed Tenex to discharge its responsibilities. Under the 1993 agreement, Russia obligated itself to extract weapons-grade HEU from dismantled nuclear warheads, dilute

the HEU by combining it with commercial reactor-grade Low-Enriched Uranium (LEU), and then deliver the resulting LEU to USEC. In exchange for this, USEC then pays Tenex partially in cash, and partially by transferring to Tenex title to uranium hexafluoride, which can be used to create LEU.[1] Under the relevant U.S. and Russian legal framework, Tenex is then able not only to ship some of that uranium hexafluoride back to Russia for use in further dilution of weapons-grade HEU pursuant to the 1993 Agreement between the United States and Russia, but also to sell portions of that uranium hexafluoride for use in the United States.

Accordingly, in January 2000, Tenex entered into a contract with GNSS, by which Tenex obligated itself to supply GNSS with specified quantities of uranium hexafluoride from 2001 until 2013 (the "Tenex Contract"). In reliance on the Tenex Contract, and with full knowledge and cooperation of Tenex, GNSS then entered into long-term supply contracts with utility customers in the United States.

In November 2003, Tenex informed GNSS that "further sales of [uranium hexafluoride] to GNSS are inimical to the interests of the Russian Federation," and that it was therefore unilaterally terminating delivery of uranium hexafluoride under the Contract beginning in January 2004. GNSS immediately commenced international arbitration proceedings, as provided for in the Tenex Contract, in Stockholm, Sweden. Additionally, GNSS brought suit in United States District

---

[1] While natural uranium contains approximately 0.711% of the fissile isotope U-235, HEU is uranium that has had the content of the isotope U-235 increased to 20% or greater. The HEU derived from Russian nuclear warheads contains more than 90% U-235. LEU, in turn, is uranium that has had the content of the fissile isotope U-235 increased beyond the natural level of 0.711% but below the 20% threshold for HEU. Commercial fuel grade LEU contains between three and five percent of the isotope U-235. The usual method for creating LEU is to "enrich" natural uranium by converting it to uranium hexafluoride, and then diffusing U-235 atoms in the uranium hexafluoride until they concentrate to approximately 5%. LEU can also be produced by diluting HEU with uranium hexafluoride. *Appellee's Br.* at 8 n.2 (redacted brief). (Because portions of the record are under seal, we refer to the redacted versions of the district court opinion and the parties' briefs throughout this opinion.)

Court in Maryland seeking an injunction requiring Tenex to continue its delivery of uranium hexafluoride to GNSS pending the outcome of the Stockholm arbitration. After a hearing, the district court issued an order and memorandum opinion dismissing GNSS's suit for lack of subject matter jurisdiction under the FSIA, holding in particular that Tenex was an instrumentality of the Russian Federation that is generally immune from suit, and that Tenex's activity relevant to this lawsuit did not constitute a "commercial activity."[2] GNSS appealed.

## II.

"We review the district court's factual findings with respect to jurisdiction for clear error and the legal conclusion that flows there-from *de novo*." *Velasco* v. *The Government of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004).

Because Tenex is wholly owned by the Russian Federation, it is an instrumentality of the Russian Federation and is thus itself considered to be a "foreign state" for purposes of the FSIA. *See* 28 U.S.C. § 1603(b)(2); *Velasco*, 370 F.3d at 398. Accordingly, it is presumptively immune from GNSS's suit unless one of the specifically enumerated exceptions in the FSIA applies to that suit. *See Saudi Arabia* v. *Nelson*, 507 U.S. 349, 354 (1993) ("Under the [FSIA], a foreign state is presumptively immune from the jurisdiction of the United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state.").

The only exception relevant here is the "commercial activity" exception, which provides as follows:

---

[2]GNSS also argued below that Tenex had waived its sovereign immunity through its agreement to arbitrate disputes arising from the Tenex Contract in Stockholm, Sweden. The district court rejected this argument, holding on the authority of *Frolova* v. *U.S.S.R.*, 761 F.2d 370 (7th Cir. 1985), that an agreement to arbitrate in another country does not waive a foreign state's immunity from suit in the United States, *see Globe Nuclear Serv. & Supply GNSS, Ltd.* v. *AO Techsnabexport*, Civ. No. DKC 2003-3339, redacted slip op. at 18-22 (D. Md. Dec. 16, 2003) ("Redacted Mem. Op."), and GNSS has abandoned this argument on appeal.

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case —

\*\*\*\*\*\*\*\*

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

To determine whether the "commercial activity" exception of section 1605(a)(2) is applicable to GNSS's lawsuit against Tenex, we must engage in a two-step inquiry. First, we must precisely identify the conduct by Tenex upon which GNSS's lawsuit is "based." Second, we must determine under section 1605(a)(2) whether that conduct constitutes "a commercial activity carried on in the United States by the foreign state;" "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere;" or "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere" and which "causes a direct effect in the United States."

**A.**

Our first task is to identify precisely the conduct by Tenex upon which GNSS's lawsuit is "based." *See Nelson*, 507 U.S. at 357 ("We begin our analysis by identifying the particular conduct on which the [plaintiffs'] action is 'based' for purposes of the Act."); *Butters* v. *Vance Int'l, Inc.*, 225 F.3d 462, 465 (4th Cir. 2000) (commencing the analysis of the applicability of the "commercial activity" exception by defining the "relevant act"). In *Saudi Arabia* v. *Nelson*, 507 U.S. 349 (1993), the Supreme Court provided the following guidance regarding the meaning of the words "based upon," for the purposes of section 1605(a)(2): "In denoting conduct that forms the 'basis,' or 'founda-

tion,' for a claim, the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Nelson*, 507 U.S. at 357.

The district court, without discussing *Nelson*, made the following statement regarding Tenex's relevant conduct:

> The dispute here is where to focus on the chain of events. If, as Plaintiff sees it, the only relevant activity occurs once the [uranium hexafluoride] is available in Kentucky at USEC, the activity looks more commercial. On the other hand, if one must consider the entire course of activity, from the blending down of the HEU in the Russian Federation to the transport of LEU to the United States and then release of the [uranium hexafluoride] and the return of any surplus to Russia, the conclusion seems inescapable that the activity is not purely commercial and remains immune.

Redacted Mem. Op. at 29-30. Having framed these two arguable interpretations of Tenex's relevant conduct, one narrow and one broad, the district court then declared that it was bound to apply the broad view:

> [T]he court must look to the reality of the situation in light of the agreements and the overall context of the contract. As part of the HEU Agreement, the United States authorized the Russian Federation, through its Executive Agent, to use USEC, the American Executive Agent, as a conduit for the processing of the uranium. To encourage the dismantling of the nuclear warheads, the Russian Federation may distribute the [uranium hexafluoride] through USEC. Unused quantities must be returned to Russia, however, and may not be sold by Tenex on the open market. Thus, the contract between Tenex and GNSS allowing GNSS to broker a portion of that [uranium hexafluoride] is part of the sovereign activity of the Russian Federation and therefore immune.

Redacted Mem. Op. at 31. In effect then, if not in explicit terms, the district court held that the conduct upon which GNSS's lawsuit is "based," for the purposes of 28 U.S.C. § 1605(a)(2), is not limited to

Tenex's entrance into a contract to supply GNSS with uranium hexa-fluoride and unilateral termination of this obligation, but includes the entire framework by which Russia has agreed to dismantle its nuclear weapons and convert weapons-grade HEU into commercial-grade LEU.

The district court's capacious view of the conduct upon which GNSS's lawsuit is "based" cannot be reconciled with the Supreme Court's decision in *Nelson*. Under that precedent, we must turn our attention not to "the reality of the situation in light of the agreements and the overall context of the contract," as the district court did, Redacted Mem. Op. at 31, but to the specific claim GNSS has asserted against Tenex, and the elements of that claim that, "if proven, would entitle [GNSS] to relief under [its] theory of the case." *Nelson*, 507 U.S. at 357; *see also Weltover* v. *Republic of Argentina*, 941 F.2d 145, 150 (2d Cir. 1991), *aff'd* 504 U.S. 607 (1992) (noting that courts must "isolate the specific conduct that underlies the suit, rather than focusing on 'the broad program or policy of which the individual transaction is a part'" and warning that under an "overbroad" defini-tion of relevant conduct, "the activity would almost inevitably be characterized as sovereign in nature").

In the district court, GNSS seeks a status quo injunction requiring Tenex to continue delivering uranium hexafluoride pending the out-come of arbitration proceedings in Stockholm, Sweden. J.A. 9-16. In order to establish its entitlement to this relief, GNSS must satisfy the high standard for a preliminary injunction. *See Doran* v. *Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("The traditional standard for granting a preliminary injunction requires the plaintiff to show that in the absence of its issuance he will suffer irreparable injury and also that he is likely to prevail on the merits."); *see also Safety-Kleen, Inc. (Pinewood)* v. *Wyche*, 274 F.3d 846, 868 (4th Cir. 2001) (Luttig, J., concurring) ("The Supreme Court has consistently applied the four-part test governing the decision on an injunction (the plaintiff's likeli-hood of success on the merits, the harm to the plaintiff in the absence of the injunction, the harm to the defendant upon grant of the injunc-tion, and public interest) without ever distinguishing among the four parts as to analytical order, priority, or weight. And it has collectively referred to these undifferentiated parts as 'the traditional standard' for injunctions."). In particular, to establish likelihood of success on the

merits, GNSS will need to prove that a valid contract exists between it and Tenex, that Tenex has unilaterally declared that it will no longer perform its obligations under the contract, and that this declaration by Tenex constitutes a breach of the contract. As this analysis shows, the entrance into the Tenex Contract and the unilateral declaration of non-performance by Tenex are the only conduct that constitute "elements" of GNSS's claim, and, if proven, would entitle GNSS to relief.

We do not deny that GNSS's complaint includes background information regarding the signing of the Agreement "concerning the disposition of highly enriched uranium extracted from the nuclear weapons" between the United States and the Russian Federation in 1993. J.A. 12. But this is background information which, while factually relevant to explaining how the Tenex Contract came into existence, is not at all necessary for GNSS to prove in order to prevail in its suit for injunctive relief. Put another way, even if the source for the uranium hexafluoride that Tenex is obligated to deliver to GNSS were other than it is (an agreement between the United States and the Russian Federation in which the Russian Federation dismantles nuclear warheads, downblends HEU into LEU, delivers the resulting LEU to USEC, and then receives uranium hexafluoride in exchange therefor), GNSS could still prevail. *Compare Nelson*, 507 U.S. at 359 ("While [background] activities led to the conduct that eventually injured the [plaintiffs], they are not the basis for the [plaintiffs'] suit. Even taking each of the [plaintiffs'] allegations about [background facts] as true, those facts alone entitle [plaintiffs] to nothing under their theory of the case.").

In sum, focus on the elements of GNSS's claim, as required by *Nelson*, yields the conclusion that the district court erred by taking an overly broad view of Tenex's conduct relevant to GNSS's lawsuit. For purposes of section 1605(a)(2), GNSS's action is "based upon" nothing more or less than Tenex's entrance into a contract to supply GNSS with uranium hexafluoride and subsequent repudiation thereof.)

**B.**

Having precisely identified the conduct by Tenex upon which GNSS's lawsuit is "based," we now consider whether this particular

conduct qualifies under section 1605(a)(2). In this case, our inquiry begins and ends with the first clause of that provision, because Tenex's conduct, we conclude, constitutes "a commercial activity carried on in the United States," and on this basis alone we must reverse the district court's holding that it lacked jurisdiction over the case.

Our analysis of whether Tenex's conduct qualifies under 1605(a)(2)'s first clause proceeds in two stages. Initially, we consider the harder question of whether this conduct meets the definition of "commercial activity." We then proceed, albeit briefly, to consider the much easier question of whether this conduct is "carried on in the United States."

1.

The FSIA provides that "[a] 'commercial activity' means either a regular course of commercial conduct or a particular transaction or act," and that "[t]he commercial character of an activity shall be determined by reference to the *nature* of the course of conduct or particular transaction or act, rather than by reference to its *purpose*." *Id.* § 1603(d) (emphases added).

In *Republic of Argentina* v. *Weltover*, 504 U.S. 607 (1992), the Supreme Court remarked that these provisions "leave[ ] the critical term 'commercial' largely undefined," but that because it was clear that "the [FSIA] (and the commercial exception in particular) largely codified] the so-called 'restrictive' theory of foreign sovereign immunity," "[t]he meaning of 'commercial' is the meaning generally attached to that term under the restrictive theory at the time the statute was enacted." *Id.* at 612; *see also Republic of Austria* v. *Altmann*, 124 S. Ct. 2240, 2249 (2004) (noting that the FSIA "codifie[d], as a matter of federal law, the restrictive theory of sovereign immunity"). After reviewing the description of the restrictive theory of foreign sovereign immunity given by the plurality in *Alfred Dunhill of London, Inc.* v. *Republic of China*, 425 U.S. 682 (1976), less than six months before the enactment of the FSIA, the Supreme Court provided the following guidance regarding the meaning of "commercial":

> [W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the

foreign sovereign's actions are 'commercial' within the meaning of the FSIA. Moreover, because the Act provides that the commercial character of an act is to be determined by reference to its 'nature' rather than its 'purpose,' 28 U.S.C. § 1603(d), the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.' Thus, a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods.

*Weltover*, 504 U.S. at 614 (internal citations omitted). *Weltover* thus makes clear that whether conduct is "commercial" within the meaning of the FSIA depends on whether that conduct is of the type "by which a private party engages in 'trade and traffic or commerce,'" regardless of the motive that leads the foreign state to engage in the conduct. *Id.*

The facts of *Weltover* provide a helpful illustration of precisely what the Supreme Court meant. In *Weltover*, Argentina had issued bonds, known as "Bonods," designed to refinance debts it had incurred while establishing a foreign exchange insurance contract program to overcome the instability of the Argentine currency. In holding that this bond issuance constituted "commercial activity" under the FSIA and that Argentina was not immune from suit for failure to make timely payments on the Bonods, the Supreme Court stressed that there was "nothing about the issuance of the[ ] Bonods (except perhaps its purpose) that is not analogous to a private commercial transaction." *Id.* at 615-16.

Like Argentina's issuance of the bonds in *Weltover*, Tenex's conduct upon which GNSS's lawsuit is based also constitutes "commercial activity." The entrance into a contract to supply a private party with uranium hexafluoride is the very type of action by which private

parties engage in "trade and traffic or commerce." That this is so is amply illustrated within the four corners of this case. GNSS, which is undoubtedly a private party, has itself engaged in conduct that is almost exactly identical to Tenex's: on the strength of its supply of uranium hexafluoride from Tenex, GNSS in turn entered into long-term supply contracts to supply a number of utility customers in the United States with uranium hexafluoride. J.A. 12. Thus, not only is Tenex's conduct *generally* of the type by which private parties engage in "trade and traffic or commerce," but it is *specifically* of the type by which a private party involved in the present case has already engaged in "trade and traffic or commerce." The logic of this comparison points forcefully toward the conclusion that the district court erred when it held that GNSS's lawsuit was not based upon "commercial activity."

Urging the contrary conclusion, Tenex raises a number of arguments, all of which ultimately fail.

First, Tenex argues, "the Russian Federation is not merely dealing in uranium; it is *regulating* its inventory of [uranium hexafluoride] and LEU supply in a manner that no private player can." *Appellee's Br.* at 40 (redacted brief) (emphasis added). But this stylized usage of the term "regulation" proves far too much. Under Tenex's usage, it would also follow that a government which enters into a contract to purchase bullets for its army is "regulating" its bullet supply, or that the government of Argentina, in *Weltover*, was "regulating" its money supply. *But see Weltover*, 504 U.S. at 614, 616-17 (unambiguously stating that a foreign state's contract to purchase bullets for its army would constitute commercial activity, and holding that Argentina's issuance of bonds constituted commercial activity). As these examples show, acceptance of Tenex's usage of "regulation" is not only inconsistent with the Supreme Court's decision in *Weltover*, but would also strip the "commercial activity" exception of much, if not all, of its meaning, for a foreign state would almost always be able to characterize its activities as sovereign "regulation" of some subject matter related to the conduct at issue.[3]

---

[3]Aside from the general objection regarding Tenex's misuse of the term "regulation," there is another reason why we cannot rely on Tenex's

Next, Tenex raises related arguments designed to focus attention on the sensitive and strategically significant nature of the particular subject matter of the Tenex Contract. The district court, in addition to accepting Tenex's overly broad description of its conduct as discussed above, also succumbed to these arguments, emphasizing that "[t]he case at hand does not involve a 'garden variety' contract for the sale and purchase of a commodity readily available on the open market," but that the subject matter of the contract was "the uranium that results from the blending down of HEU to LEU as part of the process of dismantling nuclear warheads," which the district court characterized as "sovereign" and as "a finite asset, belonging only to the Russian Federation, and uniquely available in this country only through the entire relationship of the HEU/LEU agreement and other implementing documents." Redacted Mem. Op. at 29.

Unlike the district court, we find unpersuasive Tenex's arguments based on the subject matter of this contract. Uranium hexafluoride is not a substance to which the Russian Federation has a unique claim. Private companies also possess, use, and conduct trade in uranium hexafluoride, as has already been demonstrated within the four corners of this case. To be sure, the uranium hexafluoride market is a heavily-regulated industry; but it is also an industry in which private parties can and do engage in commerce within the bounds of the pertinent regulatory overlay. Even a foreign state can engage in commercial activity in such a market, for a foreign state can engage in the type of actions by which a private party engages in "trade and traffic or commerce" even in a market that is highly regulated.

---

characterization of its activity as "regulation" of its supply of uranium hexafluoride in order to ensure that the Russian Federation has a sufficient quantity of this commodity on-hand in order to fulfill its down-blending obligations under the HEU Agreement. In particular, this characterization requires us to look to the "purpose" behind Tenex's repudiation of its contract with GNSS, which purpose the FSIA expressly forecloses us from considering. 28 U.S.C. § 1603(d). We can no more rely on Tenex's assertions regarding the purpose of its breach (to "regulate" the Russian Federation's own supply of uranium hexafluoride) than we can rely on GNSS's contrasting assertions regarding the purpose of Tenex's breach (to eliminate the middleman so that Tenex can deliver directly to GNSS's customers and thus turn a greater profit).

It does not change the analysis to emphasize that under United States law, the uranium that USEC transfers to Tenex as part of the overall structure of the HEU agreements is deemed to be of "Russian origin." *See* 42 U.S.C. § 2297h-10(b)(3). Because our conclusion that Tenex's conduct constitutes "commercial activity" in no way rests upon the practical reality that the uranium hexafluoride that comprises the subject matter of the Tenex Contract actually appears to be of other than Russian origin, it is not altered by a statute that commands us nonetheless to view that uranium hexafluoride as being of Russian origin.

Tenex further contends that, beyond viewing the uranium hexafluoride as being of "Russian origin," we must view it as constituting "natural resources" of the Russian Federation. Tenex then asserts, while purporting to rely on the Ninth Circuit's decision in *MOL, Inc.* v. *People's Republic of Bangladesh*, 736 F.2d 1326 (9th Cir. 1984), as well as dicta from the Seventh Circuit's decision in *Rush-Presbyterian-St. Luke's Medical Center* v. *Hellenic Republic*, 877 F.2d 574 (7th Cir. 1989), that because a contract involving the "natural resources" of a country must itself be viewed as "sovereign" and not as "commercial activity," Tenex's entrance into a contract to supply GNSS with uranium hexafluoride is also sovereign activity under the authority of *MOL* and *Rush-Presbyterian*. *See Appellee's Br.* at 40-42 (redacted brief).

The answer to Tenex's argument is that Tenex reads *MOL* and *Rush-Presbyterian* much too broadly. Neither *MOL*, nor the dicta from *Rush*, can fairly be deemed to establish a rule that all contracts involving a country's "natural resources" or some derivation therefrom are "sovereign" and not "commercial." In *MOL*, the Ninth Circuit held that a government had engaged in sovereign activity and not commercial activity when it granted a license to a private party to operate within that government's territory and to "capture and export rhesus monkeys." 736 F.2d at 1327-29. And the dicta in *Rush*, that "a contract whereby a foreign state grants a private party a license to exploit the state's natural resources is *not* a commercial activity, since natural resources, to the extent they are 'affected with a public interest,' are goods in which only the sovereign may deal," 877 F.2d at 574, did not actually extend beyond the type of circumstance presented in *MOL*. Together, we read the decision in *MOL* and the dicta

in *Rush* to stand not for the overly broad proposition that all contracts involving "natural resources" or their derivative products constitute sovereign activity, but for the narrower and much sounder principle that the grant of a license to operate within sovereign territory and to extract natural resources from within that territory is sovereign activity. *See also Honduras Aircraft Registry Ltd.* v. *Gov't of Honduras*, 119 F.3d 1530, 1537 (11th Cir. 1997) ("The basis of [*MOL*] was not the alleged breach of the government contract for the sale of monkeys, but its revocation of the export license. That was part of the sovereign's right to regulate its exports and was therefore immune.").

This principle has no application here, however. Tenex has not granted GNSS a license to operate within Russian territory and to extract Russian natural resources. Rather, Tenex has obligated itself to supply GNSS with what can at best be characterized as derivative products of already-extracted Russian natural resources. In undertaking this obligation and then unilaterally repudiating it, Tenex has participated in the trade of uranium hexafluoride in the manner of a private party, and has thus engaged in "commercial activity" within the meaning of the FSIA.

### 2.

We also hold that Tenex's "commercial activity" on which GNSS's lawsuit is based constitutes "commercial activity carried on in the United States" and thus satisfies the first clause of section 1605(a)(2). The FSIA provides that "a 'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contact with the United States." *Id.* § 1603(e). It is readily apparent that Tenex's conduct has "substantial contact with the United States" and thus fits comfortably under this definition. First, GNSS is a United States corporation. Second, under the terms of the Tenex Contract, Tenex transfers to GNSS title to uranium hexafluoride that is located within the United States. Third, Tenex's notice of termination, the catalyst for GNSS's claim, was served upon GNSS at GNSS's principal place of business within the United States, in Bethesda, Maryland. J.A. 11.

Given these ties, it is clear that Tenex's conduct has "substantial contact" with the United States and thus constitutes "commercial

activity carried on in the United States." GNSS's lawsuit, which is based upon Tenex's conduct, is thus covered under the first clause of section 1605(a)(2). Accordingly, the district court's holding that it lacked jurisdiction over this lawsuit under the FSIA must be reversed.

## III.

Tenex argues that, even if the district court erred in holding the "commercial activity" exception inapplicable, the district court's dismissal of GNSS's lawsuit may be affirmed on other grounds. In particular, Tenex contends that it has not been properly served, because GNSS's attempts at service thus far have not complied with the requirements of 28 U.S.C. § 1608(b), which provides special rules for service of process on an instrumentality of a foreign state. Tenex also asserts that other provisions of the FSIA which limit the availability of judicial process against a foreign state's assets, *see* 28 U.S.C. § 1609, an Executive Order blocking Russian Federation assets directly related to the HEU Agreement, *see* Exec. Order No. 13,159, 65 Fed. Reg. 39,279 (June 21, 2000), and justiciability doctrines such as the Act of State doctrine, *see W.S. Kirkpatrick & Co.* v. *Envt'l Tectonics*, 493 U.S. 400, 404 (1990), will ultimately bar the precise relief GNSS seeks.

Because the district court erroneously dismissed GNSS's lawsuit for lack of jurisdiction under the FSIA, however, the district court has not yet had occasion to rule on any of Tenex's alternative arguments.[4] In any case, "[t]hat a remand to the District Court may be of no avail to [the plaintiff] is irrelevant to our task here; if the jurisdictional requirements of the FSIA are met, the case must be remanded to the trial court for further proceedings." *Nelson*, 507 U.S. at 376 (Kennedy, J., concurring in part and dissenting in part).

---

[4]The district court did include in its opinion a discussion of the parties' arguments relating to service of process. Redacted Mem. Op. at 13-17. But due to its conclusion that it lacked jurisdiction over the case, the court declined to resolve these arguments.

## CONCLUSION

The judgment of the district court is reversed and the case is remanded for further proceedings.

*REVERSED*